**Tina WALL, Individually, and on behalf of all others similarly situated, Plaintiff;**

v.

**SUNOCO, INC. and Sun Pipe Line Co., Defendants.**

No. 3:01CV809.

United States District Court, M.D. Pennsylvania.

Nov. 20, 2002.

As Amended Dec. 17, 2002.

Joseph F. Roda, Dianne M. Nast, Daniel N. Gallucci, Roda & Nast, P.C., Lancaster, PA, Gregory E. Fellerman, Fellerman Law Offices, Wilkes–Barre, PA, Daniel E. Becnel, Law Offices of Daniel E. Becnel, Jr., Reserve, LA, Richard J. Arsenault, Neblett, Beard & Arsenault, Alexandria, LA, for plaintiffs.

James M. Beck, Jon A. Baughman, Pepper Hamilton LLP, Philadelphia, PA, Thomas B. Schmidt, III, Kelly Ann Cloak, Shannon C. Gierasch, Pepper Hamilton LLP, Harrisburg, PA, for defendants.

## MEMORANDUM

MUNLEY, District Judge.

Before the court for disposition is the plaintiff's motion for class certification. The plaintiff is Tina Wall who seeks to sue on her behalf individually and on behalf of all others similarly situated. The defendants are Sunoco, Inc. and Sun Pipe Line Co. The matter is ripe for disposition having been fully briefed and argued. For the reasons that follow, the motion will be denied.

### Background

According to the plaintiff the facts are as follows: On January 19, 2000, a valve ruptured on defendants' pressurized gasoline pipeline spraying a geyser of gasoline into the air throughout the Back Mountain area in Jackson Township, Luzerne County, Pennsylvania. The rupture released between 4,500 to 5,500 gallons of gasoline. As a result, gasoline containing the additive methyl tertiary butyl ether ("MTBE") vaporized into the air and many people were exposed to toxic levels of MTBE. Based upon these alleged facts, the plaintiff claims that those who were exposed to toxic levels of MTBE should have their health monitored to provide for early detection and treatment of neurotoxicity caused by MTBE.

Defendant Sun Pipe Line, Co. has conceded liability for the release. The only issue therefore is whether medical monitoring is warranted. Plaintiff requests a court-managed medical monitoring program funded by the defendants. Plaintiff filed this lawsuit as a class action and now moves for class certification.[1]

### Jurisdiction

We have jurisdiction over the instant case because plaintiff's claims are based in part on a federal law, the Oil Pollution Act, 33 U.S.C. § 2701 et seq., and pursuant to 28 U.S.C. § 1331, district courts have original jurisdiction of all civil actions arising under the laws of the United States.

### Discussion

In order for this case to be maintained as a class action certain prerequisites must be met by the plaintiff. These are set forth in FED. R. CIV. P. 23(a). Once those prerequisites are met, the plaintiff must establish that

---

1. The Local Rules provide that within ninety (90) days of filing a complaint in a class action, the plaintiff shall move for a determination as to whether the case is to be maintained as a class action. LR 23.3.

it is a proper case to be maintained as a class action as set forth in FED. R. CIV. P. 23(b). We shall address these two sections of Rule 23 separately.

## A. Requirements of FED. R. CIV. P. 23(a)

Pursuant to FED. R. CIV. P. 23(a) the following must be established for certification of a class:

1) A class so numerous that joinder of all members is impracticable (Numerosity);

2) Questions of law and fact common to the class (Commonality);

3) The class representative's claims or defenses must be typical of the claims or defenses of the class (Typicality); and

4) The class representative must "fairly and adequately" protect the interests of the class (Adequacy).

Plaintiff bears the burden of establishing these elements. *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir.1994), and she claims that all the requirements have been met. On the other hand, the defendant asserts that none of the elements have been met in the instant case. We address each factor below, *seriatim.*

### 1. Numerosity

■ Plaintiff must first establish that the class is so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a). The law provides no minimum number of plaintiffs to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds forty, the first prong of Rule 23(a) has been met. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001), cert. denied, —— U.S. ——, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002). Thus, to establish numerosity, plaintiff must demonstrate the number of people in the proposed class.

In the instant case, the complaint identifies the class as: "All persons who resided and were present in the Class Affected Area on January 19, 2000. The Class excludes: (1) Defendants, their officers, directors, and current employees; (2) all attorneys and their staff involved in this litigation and (3) the presiding judicial officer and the presiding judicial officer's staff. The Class Affected Area is defined by reference to the Air Model Map, which is attached to this Complaint as Exhibit 'A'." Compl. ¶ 29.

Plaintiff's complaint asserts that the air modeling indicates that persons within .53 miles of the release were exposed to medically significant levels of "gasoline vapors." Compl. ¶ 31. The complaint further states that the class consists of approximately five hundred (500) persons who live within that .53 mile radius. It is the plaintiff's burden on the motion for class certification to establish that these assertions are true and justify certifying the class. *Baby Neal*, 43 F.3d at 55. In other words, she must establish the boundaries of the class affected area and the number of people who were present in the area.

The map plaintiff refers to in order to define the class affected area contains a series of concentric circles as well as a narrow ellipse shaded pink. In her initial brief, plaintiff explains that "[t]he elliptical shaded area on the Air Model Map represents persons who were probably exposed to more than two parts per million [MTBE] based on wind direction and other calculations." Pl. Brief in Support of Class Cert. at 5. According to the plaintiff, 2 ppm MTBE is a medically significant amount exposure which justifies inclusion in the class.[2]

Plaintiff then proceeds to assert that the class certification includes the .53 mile radius around the station where the rupture occurred which is an area larger than the area of the pink ellipse. This later assertion is consistent with the Plaintiff's First Amended Class Action Complaint, para. 31–32. The ring on the map that corresponds to a .53 mile radius contains a portion of the pink ellipse. Plaintiff does not explain why the

---

**2.** To support the assertion that 2 ppm MTBE is medically significant, the plaintiff has submitted the declaration of William E. Shell, M.D. FACC which reads in relevant part, "Neurotoxicity should be monitored in any patient who has suffered an acute exposure to 2 ppm or more of MTBE. An acute exposure is any exposure less than 72 hours." Pl. Brief in Support at ¶ 36. The defendants vigorously deny that exposure to 2 ppm of MTBE is dangerous.

full radius needs to be considered when her brief states that it is the people in the ellipse who were exposed to 2 ppm MTBE. Moreover, plaintiff presents no evidence of the number of houses present in the ellipse or in the total .53 mile radius.

Defendants note that at best only nine structures are present in the plaintiff's ellipse. Def. Ex. E, Report of Mark Garrison, para. 29 (stating that the "area affected by the plume... is mostly uninhabited and includes no more than nine identifiable structures.") In her reply brief, the plaintiff contends that 100 homes are located within a .53 mile radius.[3] In reply, she also presents the affidavit of Dr. Fthenakis. The affidavit is not clear on the issue of where the affected area is. It reads in relevant part: "The hazard area likely affected by the considered gasoline release and subsequent spill is a circle with a minimum radius of 0.53 miles to 0.92 miles, extending in all directions from the pump station. This hazard zone is defined by concentrations of MtBE equal to or greater than 2 ppm, and concentrations of total gasoline vapors equal or greater than 120 ppm." Ex. A to Pl. reply brief at 7.

Plaintiff states that "A good faith estimate is that hundreds of persons live within the .53–mile class affected area." Pl. reply brief at 2. Plaintiff, however, does not explain the manner in which she calculated this number. Plaintiff attempts to establish the number of homes in the area by arguing that the Pennsylvania Department of Environmental Protection evacuated 100 homes because of the rupture and that these 100 homes correspond with their class affected area. Once again, however, plaintiff provides no proof that the evacuated homes fall within the claimed area.

Moreover, the parties disagree as to the meaning of the air modeling map. The caption of the map reads in part: "The elliptical concentration footprints correspond to the mean wind direction whereas the circles correspond to 95% concentration confidence limits based on the fluctuations ... of wind direction." *See* Complaint Ex. A. Plaintiff's contention is that "95%" refers to likelihood that those within that circle were exposed to up to two parts per million MTBE. N.T. Oral Argument, 6/19/02 at 37.

Plaintiff has not provided us with expert testimony on how to read the map. Defendant, on the other hand, has presented expert testimony that explains the "95%" as follows:

> Plaintiff's definition incorrectly suggests that ALOHA's 95% confidence default wind direction means that anyone with the 0.53 mile circle was 95% likely to be exposed to 2 ppm MTBE. This is completely false, and that interpretation is not advanced by Dr. Fthenakis [plaintiff's expert] or supported by any data. ALOHA's wind direction confidence limits address only the likelihood that, going forward, the wind may shift, and if it shifts the areas in other directions that might be exposed. Such predictive information is important for a first responder to know, but is of minimal value when analyzing an event in hindsight. Actual weather data from not only the Wilkes–Barre Scranton Airport, but from every available NWS monitoring station within 60 miles establishes that the wind did not shift direction, but rather continued to blow towards the east-north-east at increasing speeds.

Defendant's Ex. E, Report of Mark E. Garrison, Air Quality Meteorologist at ¶ 23.

We are left with serious questions regarding the number of people exposed to what plaintiff contends is a medically significant amount of MTBE. In order to make the determination regarding the number of people in the proposed class, we would need to hold an evidentiary hearing and make findings as to the number of people affected. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir. 2001) ("Before deciding whether to allow a case to proceed as a class action, courts

---

**3.** Plaintiff argues that defendant's own interpretation of the air modeling shows over 100 structures in the class affected area, and that most of these structures are homes. In support of these propositions plaintiff cites Defendants' Exhibit C. Defendants' Exhibit C, however, does not support plaintiff's claim that over 100 structures are in the area. The exhibit is the report of Gary L. Lage, Ph.D., D.A.B.T. A review of the report reveals that Dr. Lage does not opine regarding the number of structures in the affected area.

should make whatever factual and legal inquiries are necessary under Rule 23.")[4] We need not make that determination though, because as explained more fully below, the plaintiff has failed to meet other Rule 23 requirements.

### 2. Commonality

The next prerequisite that the plaintiff must establish pursuant to Rule 23(a) is commonality. To establish this element, the plaintiff must demonstrate questions of law and fact common to the class. In the instant case, the defendants accept liability for the spill. The only question that remains, as far as the class is concerned, is whether medical monitoring is necessary. Plaintiff claims that this question is a common question to all of those exposed to the minimum amount.

■ In order to sustain an action for medical monitoring, the plaintiff must establish the follow requirements: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Barnes v. American Tobacco Co.*, 161 F.3d 127, 138–39 (3d Cir.1998), *cert. denied*, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999) (citing *Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137, 145–46 (1997)). Plaintiff claims that she can prove the first element based upon air modeling, and that the remainder are common to all potential class members and can be established at trial by expert testimony. Defendant claims that it has presented sufficient contradictory expert testimony to establish that plaintiff has not met these requirements.

An in-depth analysis of these factors is rendered unnecessary based upon our finding below that the next two requirements are not met. Suffice it to say that it appears that the plaintiff is accurate when she argues that many of these questions are common to the whole class.

### 3. Typicality

■ The third class action certification prerequisite is that the class representative's claims or defenses must be typical of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). This element is referred to as typicality. For the reasons that follow, we find that the claims and defenses of the plaintiff are not typical of those of the class she seeks to represent.

The Court of Appeals for the Third Circuit has described typicality as follows:

> The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented.... The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees.... Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based. Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the

---

4. We are not convinced of plaintiff's position as set forth in the reply brief that it is not appropriate for a district court to determine the credibility of experts in deciding a motion for class certification. While that might be the case for some class certification issues, it is not the case with regard to numerosity. The court must determine numerosity before allowing a case to proceed as a class action. It is not a question that can be reserved for the factfinder to determine at the end of the proceeding. Such a result would be incompatible with the requirement that the plaintiff establish numerosity before an action is allowed to proceed as a class action.

putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims. Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold. Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.

*Baby Neal,* 43 F.3d at 57–58 (internal citations and quotation marks omitted).

In the instant case, the plaintiff argues that her claim for medical monitoring is typical of, and in fact identical to, the claim of the proposed class. Further, she contends that typicality is established because the claims of all the potential class members are based on a single event and the issue common to all is whether medical monitoring is warranted. Accordingly, plaintiff argues that her interests are aligned with those of the class and that her pursuit of her claim will advance the interests of the entire class.

Defendants, on the other hand, claim that plaintiff is atypical of the class that she is attempting to represent. First, the defendants assert that the plaintiff is not even a member of the class as the record contains no evidence of her exposure to 2 ppm MTBE. In addition, the defendants argue that the plaintiff's medical history gives rise to unique factual defenses.

We disagree with the defendants' first argument, that no evidence establishes that the plaintiff was exposed to at least 2 ppm MTBE. Plaintiff has submitted a report by V.M. Fthenakis, Ph.D., which states that the estimated ground level ambient concentrations of MTBE at the plaintiff's residence were 20–30 MTBE. *See* Exhibit A to the Plaintiff's Reply Brief at ¶ 11.[5]

To analyze the defendants' next argument, it is important to understand the causes of action set forth in the complaint. The complaint contains more than the class action allegations for medical monitoring. It also asserts an individual personal injury claim on behalf of Tina Wall. The complaint reads in pertinent part: "Plaintiff sustained severe injuries, including neurotoxic syndrome and induced cardiac abnormalities, as a result of her exposure to gasoline vapor and its components.... Plaintiff has sustained damages including, but not limited to medical, hospital and pharmaceutical expenses, personal injury, mental and economic damages (including but not limited to lost wages), inconvenience, fear and fright, fear of contracting serious illness, and emotional damages." Pl. First Am. Compl. ¶ 40–41. Plaintiff's medical expert describes the plaintiff's condition as follows

> Ms. Tina Wall exhibits symptoms of neurotoxicity including bilateral headaches, a memory disorder, double vision, an inability to concentrate, episodes of anxiety and depression, tremor, a sleep disorder, problems with motor coordination, abnormal sensations in her limbs and temperature dysregulation. She also reports symptoms that may indicate cardiotoxicity; these include intermittent palpitations and intermittent episodes of rapid heartbeat that have occurred since the exposure. She asserts the that the frequency of her seizures have increased since January 2000.

Def. Ex. Y, Expert Medical Opinion of William E. Shell, M.D. FACC, ¶ 39.

Dr. Shell also diagnosed plaintiff with autonomic nervous system dysfunction. This is characterized by suppression of heart variability, suppression of the parasympathetic component of the autonomic nervous system, suppression of the sympathetic nervous system and suppression of circadian rhythms. *Id.* at ¶ 43. She also has an autonomic imbalance, with predominance of sympathetic function. According to Dr. Shell, the abnormality of autonomic function and altered heart rate variability confers an increased risk of sudden death. Her symptoms include a sleep disorder, temperature dysregulation, cognitive disorder, memory disorder and mood disorder. *Id.*

---

5. Defendants' assertion that plaintiff did not provide this evidence is understandable as it was not filed until after the defendants submitted their brief, and the evidence submitted up to that point is less than clear.

The fact that the plaintiff claims to be injured, in and of itself, appears to make her atypical of the class. She claims to suffer from the same maladies, neurotoxicity and cardiac abnormalities, for which she seeks to have the class monitored. The other potential class members have not yet demonstrated symptoms, but allegedly have been exposed to the chemical that can cause medical problems. This aspect of the case will be discussed more fully in the next section in that it also makes her an "inadequate" class representative.

Next, it appears that the defendants have defenses that they will be able to use against the plaintiff that they would not be able to use against the other potential plaintiffs. The plaintiff has suffered from various ailments, including seizures, for which she has taken various medicines that could raise defenses to her claim.[6] The symptoms she describes having after the exposure to MTBE are similar to the side effects of medicine she has taken for ailments unrelated to the gasoline fumes. *See* Def. Ex. H, 97–104. For example, Tegretol, one of the medicines that plaintiff took before her exposure to MTBE can cause headaches. In fact, one of the plaintiff's physicians in 1998 concluded that Tegretol may have been causing headaches that the plaintiff suffered from at that time. *Id.* at 97. Heart-rate variability can also be caused by Tegretol. *Id.* at 98.

In addition, the plaintiff has taken the prescription drug Xanax. Side effects of this drug include, *inter alia,* depression, headache, confusion, insomnia, nervousness, dizziness, tiredness, sleepiness, fatigue, impaired coordination, memory impairment, cognitive disorder and muscle twitching. *Id.* at 101–02. These are all symptoms that she has claimed to have suffered after the gasoline vapor exposure. *Id.* at 102.

It is apparent that the defendants are developing a defense that the problems the plaintiff complains of are side effects of the medicine she takes, not as a result of the exposure to MTBE. It is predictable then that a major focus of the trial will be the plaintiff's medical problems and the possibility that they are actually side effects to medications that she plaintiff takes and not MTBE. This defense is unique to the plaintiff as we can assume that the potential class members do not all suffer the same ailments and take the same medication as the plaintiff. Such a defense, which would no doubt take up much of the trial, is atypical of the class.

The plain language of Rule 23(a) provides that the defenses applicable to the representative must be typical of the class. Hence, it has been held that a named plaintiff is not a proper class representative if it is predictable that a major focus of the litigation will involve an arguable defense unique to the named plaintiff or a small subclass. *Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 392 (D.N.J.1998) (citing *State of Alaska v. Suburban Propane Gas Corp.,* 123 F.3d 1317, 1321 (9th Cir.1997) and *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)). We find, therefore, that plaintiff is not typical of the class she is attempting to represent. *See also Keyser v. Commonwealth Nat. Financial Corp.,* 121 F.R.D. 642, 646 (M.D.Pa.1988) (stating that where a major focus of the litigation will be on an arguable defense unique to the named plaintiff class certification should be denied).

#### 4. Adequacy

The final prerequisite of Rule 23(a) is that the class representative fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). This element serves to uncover conflicts of interest between named parties and the class they seek to represent. It also functions as a catch-all requirement that tends to merge with the commonality and typicality criteria of Rule 23(a). *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 185 (3d Cir.2001). Together with the commonality and typicality prerequisites, the adequacy requirement serves as a guidepost for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and

---

**6.** We make no determination as to the merits of these defenses; we merely note that they are likely to be raised.

the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626, n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ More specifically, the adequacy prerequisite involves two distinct inquiries that are designed to protect the interests of absentee class members. First, the adequacy of representation inquiry examines the qualifications of the counsel to represent the class. Second, it serves to uncover any conflicts of interest between the named parties and the class they seek to represent. *In re Prudential Ins. Co. of America Sales Practices,* 148 F.3d 283, 312 (3d Cir.1998), cert. denied *sub nom., Krell v. Prudential Ins. Co. of Am.,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

Plaintiff claims that she has met the first inquiry as her counsel is experienced in conducting complex litigation. The defendants do not challenge the adequacy of plaintiff's counsel to prosecute this action. At oral argument, plaintiff's counsel indicated that he has been involved in numerous class actions. N.T. 6/19/02 at 2. Therefore, our review of the entire record convinces us that counsel is eminently qualified to represent the class.

■ The second inquiry is used to uncover conflicts of interest between the named parties and the class that they seek to represent. *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625–26, 117 S.Ct. 2231. As to this second inquiry, the plaintiff claims that her interests parallel those of the class. Her position is that she has an interest and claim for medical monitoring to ensure early detection and treatment of induced neurotoxicity.

Defendants argue that plaintiff has a conflict with the class that she is attempting to represent because she claims to have present injuries while she is attempting to represent a class of presently asymptomatic persons. Defendants assert that the likelihood that the plaintiff will pursue her present injury to the

detriment of the asymptomatic class disqualifies her as a class representative. For the reasons that follow, we agree that a conflict of interest exists.

Several cases have addressed the conflict between representatives who are already injured and those who have only been exposed to a hazardous substance and seek medical monitoring although they currently suffer no injury. The cases find that a conflict of interest exists between the presently injured and the exposure-only plaintiffs.

In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the United States Supreme Court addressed the difference between the already injured and uninjured, exposure-only, plaintiffs in the class action context. The Supreme Court refused to allow a class of already injured parties to represent the interests of uninjured, exposure-only, plaintiffs in a class action settlement. It found that the goals of the two groups were in conflict. The currently injured representatives' goal was immediate damages, and those who had only been exposed would seek a future fund for medical monitoring. *Amchem,* 521 U.S. at 626, 117 S.Ct. 2231 (1997); *see also Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (holding that currently injured plaintiffs and exposure-only plaintiffs do not share the same interests for the currently injured, the critical goal is generous immediate payment whereas for the exposure-only plaintiffs, the goal is to ensure an ample, inflation-protected fund for the future.)

The *Amchem* case reached the Supreme Court on appeal from the Third Circuit Court of Appeals. The original Third Circuit opinion is found at *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir.1996). Like the Supreme Court, the Third Circuit noted the conflict between the currently injured plaintiffs and the plaintiffs with possible future illnesses. *Id.* at 630–31. The court noted that "[t]he conflict between futures and presently injured plaintiffs is obvious." *Id.* at 631, n. 14 (emphasis added).

The United States District Court for the Middle District of Florida addressed the is-

sue of injured plaintiffs seeking to represent those who were not yet injured as follows:

> Plaintiffs urge that ... there is no ... antagonism because both those with and without present injuries have a common concern about the long-term health implications of exposure. While this may be true ... the court cannot ignore that the named Plaintiffs complain of extremely varied types and degrees of illness or injury as a result of exposure, and that they seek immediate compensation for past and future damages including medical expenses by way of this separate subclass. As such, their interests and motivations in the personal injury subclass are not necessarily aligned with the interest of the not-yet-injured members of the medical monitoring subclass who, at present, seek only a fund to cover costs related to their monitoring. It is not unreasonable to anticipate that because of the differences, named Plaintiffs may not seek to adequately protect the not-yet-injured members of the monitoring subclass should it develop that it is not in their interest to do so. Because of the potential for such conflict, I conclude that the requirement of adequacy of representation is not met by these named Plaintiffs.

*Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 663–64 (M.D.Fla.2001).

While these cases may not be factually identical to the case at hand, the underlying principle remains the same: a presently injured plaintiff has a conflict of interest with regard to a class of uninjured, exposure-only, individuals. Thus, we are unconvinced by plaintiff's assertion that *Amchem* has no bearing on this case.

We further reject plaintiff's reliance on *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 482 (W.D.Pa.1999) for the proposition that courts should reject efforts to defeat certification by raising the possibility of hypothetical conflicts or antagonisms among class members. As set forth above, the con-

flict in the instant has been acknowledged by district courts, the Third Circuit Court of Appeals and the United States Supreme Court. Therefore, it cannot be deemed a "hypothetical conflict."

Plaintiff contends that it is proper to have a class action with respect to certain issues and pursue other issues individually. We do agree with this position in certain circumstances. Rule 23(a)(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues. If, however, the portion of the case that the plaintiff is pursuing individually, here the personal injury claims, conflicts with the class claims, then the element of "adequacy" is not met and class certification is not appropriate.

We remain unconvinced by plaintiff's argument that her medical monitoring claim is the same as the medical monitoring claim of the class she seeks to represent. Plaintiff's expert witness asserts that he recommends the same medical monitoring for the plaintiff as he would for the whole class. *See* Pl. Reply Br. Ex. D, Dep. of Dr. Shell, at 163. Plaintiff, however, is clearly in a different position from the other potential class members. Her complaint alleges that she has sustained serious injuries and suffers from neurotoxic syndrome and induced cardiac abnormalities. Compl. ¶ 40. She seeks to represent a currently asymptomatic class and obtain medical monitoring for induced neurotoxicity and cardiac abnormalities. Compl. ¶ 46. Her claim is not the same where she is seeking to have the class monitored for the injury she herself already alleges to have. As set forth above, this situation is a conflict of interest.

Based upon the conflict of interest that the plaintiff has with the potential class members, we find that she has not met the "adequacy" requirement of Rule 23(a).[7]

7. Surprisingly, plaintiff states in her supplemental brief that the defendants never raised the issue of the conflict between the plaintiff and the class she seeks to represent in their brief in opposition to class certification. On the contrary, the defendants did raise this issue in their brief in opposition to class certification, and cited both *Amchem, supra,* and *Ortiz, supra. See* Defs' Br. in Oppo. Class Cert. at pgs. 33–34. Plaintiff, however, did not address the issue until after oral argument in the supplemental brief ordered by the court.

## B. Fed. R. Civ. P. 23(b)/Immature Tort

Plaintiff must also satisfy Fed. R. Civ. P. 23(b) to maintain her case as a class action. In order to satisfy Rule 23(b), the plaintiff must establish that her case falls into one of the following categories: 1) her case is one where separate actions create the risk of inconsistent or varying adjudications; 2) the party opposing the class has acted or refused to act on grounds generally applicable to the class making injunctive or declaratory relief appropriate; and 3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(1)–(3).

As we have found that the plaintiff has not satisfied the requirements of Rule 23(a), we need not discuss whether this case is a proper case to be maintained as a class action under Fed. R. Civ. P. 23(b). However, we will discuss the issue briefly in order to dispose of the defendants' argument that as an "immature tort" plaintiff's claim cannot proceed as a class action.

The immature tort concept holds that "a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by Rule 23[b)]." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 (5th Cir.1996), *quoted in Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 168 (3d Cir.2001). Defendant's argument is that there is no prior track record with regard to the allegations plaintiff has made regarding MTBE; therefore, this is not a proper case for a class action.

The immature tort concept applies when the court is analyzing the predominance and superiority factors for those cases that fall under Rule 23(b)(3). In the instant case, the plaintiff's case would fall under 23(b)(2), not 23(b)(3), because she is seeking injunctive relief.[8] Under 23(b)(2), the predominance and superiority factors do not apply. Hence, the immature tort concept is also inapplicable. *Barnes v. Am. Tobacco Co., Inc.*, 176 F.R.D. 479, 497, n. 3 (E.D.Pa.) aff'd 161 F.3d 127 (3d Cir.), cert. denied, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999) ("The immature tort doctrine is a doctrine which has been used to assess whether the superiority and/or predominance prongs of Rule 23(b)(3) have been satisfied; thus the immature tort theory is necessarily tied to Rule 23(b)(3). The immature tort doctrine simply is not applicable to this Court's Rule 23(b)(2) analysis....").

## Conclusion

In conclusion, plaintiff has failed to meet all the requirements for class certification as set forth in Fed. R. Civ. P. 23(a). She has not met the typicality or adequacy requirements. Moreover, we cannot determine without an evidentiary hearing whether she has met the numerosity prerequisite. Consequently, plaintiff's motion for class certification will be denied.

8. Defendants argue that plaintiff's case actually falls under Rule 23(b)(3) because she is not really seeking injunctive relief. We reject defendants' argument that plaintiff's claim is merely a thinly veiled claim for monetary damages as opposed to a genuine claim for injunctive relief. If plaintiffs seek the establishment of a court-supervised medical monitoring program through which the class members will receive periodic medical examinations, then plaintiffs' medical monitoring claim can be properly characterized as a claim seeking injunctive relief, and 23(b)(2) is the appropriate section to apply. *Barnes v. American Tobacco Co.*, 161 F.3d 127, 131–32 (3d Cir.1998) cert. denied 526 U.S. 1114, 119 S.Ct. 1760 (1999). In the instant case, the plaintiff does in fact seek a court-supervised medical monitoring program. *See* Amended Compl., Prayer For Relief, ¶ 2.