**Lipinski v. Beazer East Inc.**

*Victor H. Pribanic* and *Charles A. Frankovic,* for plaintiffs.

*Steven F. Baiker-McKee,* for defendant Beazer East.

*Debra S. Belaga,* for defendant Crompton Corp.

*Michael R. Borasky,* for defendant Indspec Chemical.

*Joseph Brendell,* for defendants Penreco & Conoco.

*Cynthia Sychak-Berry,* for defendant Dick McCall Inc.

HORAN, *J.,* October 18, 2005—Presently before this court is plaintiffs' motion for class certification arising from the alleged disposal of various chemicals by various defendants into the Bear Creek Area Chemical Site, which allegedly contaminated environmental factors over a 54-square-mile area, and allegedly caused property and personal injury damages.

## I. FINDINGS OF FACT[1]

(1) Plaintiffs originally sought to certify five subclasses, as follows:

---

1. Pursuant to the parties' stipulation of April 11, 2005, the parties agreed that the record, for purposes of this court's consideration of the

• Subclass I: All persons over the age of 18 years who are present or past owners of real property within the Commonwealth of Pennsylvania which, due to the waste disposal activities of the defendants and the environmental contamination resulting therefrom, have suffered a decrease or diminution of value or other stigma associated with its location within or proximate to the geographic area labeled by the Pennsylvania Department of Environmental Protection as the Bear Creek Area Chemical Site (Bear Creek Area).

• Subclass II: All persons who are citizens of the Commonwealth of Pennsylvania over the age of 18 years who are present or past users of the contaminated public water supply within the Bear Creek Area, and as a proximate result of exposure to contaminants through said use, are at an increased risk for developing serious latent diseases, including cancer.

• Subclass III: All persons who are citizens of the Commonwealth of Pennsylvania over the age of 18 years who are present or past users of contaminated well water within the Bear Creek Area, and, as a proximate result of exposure to contaminants through said use, are at an in-

---

motion for class certification and opposition thereto, shall include all deposition transcripts, affidavits, documents and pleadings that any party submitted in support of their respective briefs, motions, affidavits and/or opposition regarding class certification, which the parties agreed to have deemed admitted without objection solely for purposes of the court's consideration of the motion for class certification and opposition thereto. The findings entered in this case recognize that they are court findings based upon the stipulated submissions, and such findings are only for purpose of ruling upon the class certification issue. They are *not* to be construed as findings that go to the merits of the issues in the case.

creased risk for developing certain latent diseases, including cancer.

• Subclass IV: All persons who are citizens of the Commonwealth of Pennsylvania over the age of 18 years who are present or past users of the contaminated public water supply within the Bear Creek Area who have suffered and/or continue to suffer from bodily injury as a proximate result of exposure to said contaminates through said use.

• Subclass V: All persons who are citizens of the Commonwealth of Pennsylvania over the age of 18 years who are present or past users of contaminated well water within the Bear Creek Area who have suffered and/or continue to suffer from bodily injury as a proximate result of exposure to said contaminates through said use.[2] (Plaintiffs' brief at pp. 11, 22, 33 and 45 respectively.)[3]

(2) In plaintiffs' post hearing memorandum, plaintiffs now propose to certify a class that includes "All adult residents of the Commonwealth of Pennsylvania who live and/or lived within the geographic area labeled as the Bear Creek Area Chemical Site by the Pennsylvania Department of Environmental Protection during the time

---

2. In their motion for class certification, plaintiffs originally proposed certification of the five subclasses described above, and they now propose two subclasses, but they also contend that the subclasses constitute a "single class." (Plaintiffs' motion for class certification at p. 5 n.1.) The proposed findings, as set forth herein are equally applicable whether the class is considered a single class or separate subclasses.

3. Both plaintiffs and defendants submitted various exhibits with their briefs addressing the motion for class certification. The references hereafter are to the exhibits which accompanied the respective briefs.

period of 1949 to present, and all adult residents of the Commonwealth of Pennsylvania who own and/or owned real property within the Bear Creek Area Chemical Site during the time period of 1949 to present.

(3) According to the plaintiffs, said class would be defined into two subclasses as follows: property damage subclass and a medical monitoring and personal injury subclass.

(4) Plaintiffs further propose a trial management plan that would include bifurcation of trial for separate proceedings on damages for property and personal injury claimants after liability, causation and medical monitoring have been determined. Plaintiffs seek to obtain medical monitoring only for detection of onset of cancer and/ or thyroid disorders.

(5) The "Bear Creek Area" is a geographic area that is approximately 54 square miles that encompasses portions of Butler and Armstrong counties. (Defendants' exhibits E and P.) The Bear Creek Area features diverse topography and hydrogeology; it is a hilly region with numerous and different watersheds, aquifers and groundwater flow systems. (Defendants' exhibit B at ¶5.) Groundwater flow in the Bear Creek Area is also complicated by the pervasive presence of numerous manmade features, such as surface and underground mines, oil and gas wells, underground utilities, septic tanks and sewage lines, which may disrupt and fragment groundwater flow patterns.[4] (Defendants' exhibit B at ¶6.) As a

---

4. At the hearing on plaintiffs' motion for class certification, plaintiffs' counsel indicated that the case is principally about alleged injuries from exposure to drinking water (transcript at 13:19-25), although the complaint and depositions also allege injuries from exposure to air emissions. (Plaintiffs' second amended complaint at ¶¶4 and 12; de-

result of its diverse topography and hydrogeology, there is no common groundwater flow or migration pathway within the Bear Creek Area. (Defendants' exhibit B at ¶¶5-6 and 13-20.)

(6) Residents in the Bear Creek Area obtain drinking water from individual residential wells that draw from groundwater aquifers; and from municipal drinking water supply systems such as the one operated by the Petrolia Municipal Water Authority that draws from two supply wells and a spring. (Plaintiffs' exhibit 1 at pp. 7 and 13.)

(7) Plaintiff Timothy Lipinski is an adult individual residing at 204 Church Street, Petrolia, Pennsylvania, 16050. (Defendant's exhibit G, plaintiff Timothy Lipinski's reponses to interrogatories, answer 1.)

(8) Plaintiff Timothy Lipinski lived on Argyle Street, Petrolia, Pennsylvania 16050 from 1970 to 1981. He lived on Washington Street, Fairview, Pennsylvania, as well as Bruin, Pennsylvania, in the early 1990s. From approximately 1992 until 2000, plaintiff Timothy Lipinski resided at 134 Nesbit Avenue, Petrolia, Pennsylvania 16050. Plaintiff Timothy Lipinski has resided at 204 Church Street, Petrolia, Pennsylvania 16050 since June of 2000. (Defendants' exhibit G, plaintiff Timothy Lipinski's responses to interrogatories, answer 2.)

---

fendants' exhibit M at pp. 84, 176 and 207; defendants' exhibit N at pp. 43 and 73; and defendants' exhibit O at pp. 105 and 544-45.) To the extent that the case does include allegations regarding air emissions, this would inject further individualized issues into the case because, among other reasons, air dispersion of contaminants varies depending on a host of individualized factors as set forth in the affidavit of Paolo Zannetti. (Defendants' exhibit A at ¶8.)

(9) Plaintiff Timothy Lipinski has lived at six locations in the Bear Creek Area, ranging from one-quarter of a mile to five miles away from the nearest suspected waste disposal site.[5] (Defendants' exhibit O at pp. 251, 256, 260-63 and 433.) During this time, the sources of his drinking water have included private wells or springs, water provided by the Petrolia Water Authority and, more recently, bottled water. (Defendants' exhibit O at pp.136, 180-81, 184 and 186-87.) Mr. Lipinski also lived outside the Bear Creek Area for extended periods. (Defendants' exhibit O at pp. 58 and 62.) Mr. Lipinski claims that exposure to contamination caused arthritis, costachrondritis, chondromalacia, hyperlipidemia, elevated liver enzymes, acid reflux disease and other digestive disorders, heart disease, asthma and bronchitis, anxiety, depression, dental and vision problems, skin disorders and kidney problems. (Defendants' exhibit G, response no. 6.)

(10) The record is devoid of any evidence that plaintiff Timothy Lipinski currently suffers from any thyroid problems or currently has cancer. (See defendants' exhibit O, deposition transcript of Timothy Lipinski.)

(11) Mr. Lipinski also claims that his house has lost value as a result of the contamination. He has not attempted to sell it since learning of the potential contamination. (Defendants' exhibit O at pp. 30-34.) He purchased his current house in 2000 for $15,000, although an appraisal at the time valued it at $48,000, and a subsequent appraisal valued the house at $53,000. (Defendants' exhibit O at pp. 20-21, 26-28 and 546-47.)

---

5. The findings of fact for purposes of class certification only set forth are based upon plaintiffs' answers to interrogatories, deposition testimony and medical records produced by treating physicians.

(12) Plaintiffs Mark and Carol Golling are adult individuals residing at 382 Bruin Main Street, Petrolia, Pennsylvania 16050. (Defendants' exhibit H, plaintiff Carol Golling's responses to interrogatories, answer 1; defendants' exhibit I, plaintiff Mark Golling's responses to interrogatories, answer 1.)

(13) Plaintiff Carol Golling has lived at the same residence in the Bruin area since 1991. (Defendants' exhibit H, response no. 2.) Before that, she resided outside the Bear Creek Area. (Defendants' exhibit H, response no. 9.) The source of her drinking water since moving to Bruin has been a private well. (Defendants' exhibit RR at p. 11.) She started using bottled water in early 2002; before that time she only used well water for Kool Aid, iced tea and water bottles to take to work. (Defendants' exhibit RR at pp. 104 and 173.) Her house is approximately half a mile away from the nearest suspected waste disposal site (Hemlock Road). (Defendants' exhibit RR at pp. 116-17.) Mrs. Golling claims the following injuries, among others: asthma and other respiratory problems; cancerous cervical polyps; rashes; anxiety; hair loss; irritable bowel and stomach problems; and menstrual problems. (Defendants' exhibit H, response no. 6.)

(14) Plaintiff Mark Golling moved to the Bruin area in 1991. (Defendants' exhibit I, response no. 1.) He claims he drank a gallon of well water per day before switching to bottled water in 2002. (Defendants' exhibit SS at p. 93.) Mr. Golling complains of a lump in his breast; skin rashes (dermatological symptoms); muscle spasms; memory loss; headache; diarrhea; eye problems; breathing problems; anxiety; and persistent cough. (Defendants' exhibit I, response no. 6.)

(15) The record is devoid of any evidence that plaintiff Mark Golling currently suffers from any thyroid problems or currently has cancer. (See defendants' exhibit SS, deposition transcript of Mark Golling.)

(16) Mr. and Mrs. Golling bought their house for $72,000 in 1990 and have refinanced it several times. (Defendants' exhibit RR at p. 13.) In June 2003, after publicity about the alleged contamination, the house was appraised at $129,000. (Defendants' exhibit RR at p. 14.) The Gollings have not attempted to sell their house. (Defendants' exhibit RR at p. 15.)

(17) Plaintiffs Daniel and Charlotte Angert are adult individuals residing at Pine Road, Greenhill Estates, Angert Lane, Karns City, Pennsylvania 16041. (Defendants' exhibit J, plaintiff Daniel Angert's responses to interrogatories, answer 1; defendants' exhibit K, plaintiff Charlotte Angert's responses to interrogatories, answer 1.)

(18) Plaintiffs Daniel and Charlotte Angert own their previous residence at 114 Forest Street, Petrolia, Pennsylvania 16050, which they occupied until it was destroyed by fire in September of 2004, as well as their current residence on Angert Lane, Karns City, Pennsylvania 16041. (Exhibit J, plaintiff Daniel Angert's responses to interrogatories, answers 1, 2; exhibit K, plaintiff Charlotte Angert's responses to interrogatories, answers 1, 2; defendants' exhibit N, deposition transcript of Charlotte Angert, p. 12.)

(19) Plaintiff Daniel Angert has lived at various addresses within the Bear Creek Area for 38 years. (Defendants' exhibit J, response no. 2.) From 1980 through 2004, he lived approximately one mile from the nearest suspected

waste disposal site. The source of the properties' water was the Petrolia Water Authority. (Defendants' exhibit M at p. 53.) Angert claims numerous illnesses: digestive tract problems; breathing problems; irritable bowel syndrome; and ulcers. (Defendants' exhibit M at p. 306.) He also claims to suffer from congestive heart failure, seizure disorder, alcoholism, depression, sleep apnea, high blood pressure, and arthritis. (Defendants' exhibit M. at pp. 348-49.) Mr. Angert did not appear for his deposition on the grounds of illness; so this information is based upon his pleadings and discovery responses and the deposition testimony of his spouse, Charlotte Angert. (Defendants' exhibit TT.)[6]

(20) Plaintiff Charlotte Angert has lived in the Bear Creek Area for 33 years at four different locations. (Defendants' exhibit K, response no. 2.) In her various residences, she has used public and bottled drinking water. (Defendants' exhibit K, response no. 5.) She claims that she typically drank six to eight glasses of water a day. (Defendants' exhibit M at p. 43.) Mrs. Angert claims the following illnesses: cough; arthritis; cysts; stomach disorders; eye problems; sore throat; tooth decay; fatigue; headache, nervousness and skin problems. (Defendants' exhibit M at pp. 84, 81-85, 96, 98-99, 103-107, 112-14, 116, 192-93.)

(21) The record is devoid of any evidence that plaintiff Charlotte Angert currently suffers from any thyroid

---

6. In their response to defense proposed findings of fact and conclusions of law, plaintiffs represent that Daniel Angert is deceased. The pleadings have not been amended to officially place that fact of record. In light of said representation, this court is not making any findings of fact concerning Daniel Angert's medical conditions.

problems or currently has cancer. (See defendants' exhibit M, deposition transcript of Charlotte Angert.)

(22) Mr. and Mrs. Angert purchased their house for $13,000. (Defendants' exhibit M at p.133.) In 2002, the house was valued at $65,000. (Defendants' exhibit M at pp. 62-63.) The house was destroyed in a fire in 2004. (Defendants' exhibit M at p. 12.) The Angerts were subsequently paid $102,610 by their insurance company for the house and $114,000 for the contents. (Defendants' exhibit M at pp. 247-48.) The Angerts are building a new home in the Bear Creek Area on other property; the bank has provided construction financing without any restrictions based on alleged soil or groundwater contamination. (Defendants' exhibit M at p. 250.)

(23) Plaintiff David J. Christy is an adult individual residing at 151 Main Street, Petrolia, Pennsylvania 16050. (Defendants' exhibit L, plaintiff David J. Christy's responses to interrogatories, answer 1.) He has owned said residence since January of 1997.

(24) Plaintiff David Christy has lived at two different locations within the Bear Creek Area for a total of eight years. (Defendants' exhibit L, response no. 2.) Mr. Christy claims that he only drank two to three glasses of water per week from the Petrolia Water Authority and that he has used bottled water since March 2002. (Defendants' exhibit L, response no. 15.) At his deposition, Mr. Christy denied having the illnesses described in the complaint or in his answers to defendants' interrogatories. (Defendants' exhibit N at pp. 87-88.) Instead, he claims to suffer from allergies and a right shoulder that "droops." (Defendants' exhibit N at p. 69.) Mr. Christy acknowledged that no doctor has advised him that environmen-

tal contamination could be the cause of any of his claimed injuries. (Defendants' exhibit N at p. 74.) Christy bought his home in 2001 for $27,800. (Defendants' exhibit N at p. 16.) He has not tried to sell his house or have it appraised. He has not contacted a real estate agent and has no information as to the current value of his home. (Defendants' exhibit N at p. 21.)

(25) The record is devoid of any evidence that plaintiff David J. Christy currently suffers from any thyroid problems or currently has cancer. It is further lacking any evidence that he currently suffers from gastrointestinal problems, dermatological problems, or respiratory problems which were being attributed by the original class designation to contaminated water. (See defendants' exhibit N, deposition transcript of David J. Christy.)

(26) Plaintiff David J. Christy suffers from allergy-like nasal symptoms including persistent, year-long, runny nose (respiratory symptoms) which he attributes to his exposure to and consumption of water contaminated by defendants. (Defendants' exhibit N, deposition transcript of David J. Christy, p. 64.)

(27) None of the six named plaintiffs has had the water at his or her home tested to determine whether any contaminants are present. (Defendants' exhibit G through L, response no. 5 (respectively).)

(28) None of the named plaintiffs has tried to sell his or her home since at least 2002. (Defendants' exhibit M at pp. 23 and 220; defendants' exhibit N at p. 22; defendants' exhibit O at pp. 30-32; defendants' exhibit RR at p. 15; and defendants' exhibit SS at p. 68.)

(29) The named plaintiffs did not submit any evidence from treating physicians or other medical experts spe-

cifically attributing any of their alleged injuries to exposure to contamination. (Defendants' exhibit C at ¶12; defendants' exhibit M at pp. 86, 90, 94, 96 and 103-104; defendants' exhibit N at pp. 48, 73-74 and 76; and defendants' exhibit O at pp. 207-208, 210-12, 214, 218 and 363; defendants' exhibit RR at pp. 69-70 and 77-78; and defendants' exhibit SS at 59-60.) The only evidence relied upon by plaintiffs concerning the medical issue of causation is a letter of Harlee Strauss Ph.D., who stated that "[s]ome of the health effects reported by multiple individuals in the community . . . are consistent with health effects related to overexposure to resorcinol and/or sulfonic acids." (Plaintiffs' exhibit 9 at p. 5.) Dr. Strauss acknowledged, however, that she had not "conducted any calculations related to the intensity of exposure at this time." (Plaintiffs' exhibit 9 at p. 5.) Nor did Dr. Strauss perform any medical assessment of the named plaintiffs or putative class members to determine whether their claimed symptoms were, to a reasonable degree of scientific certainty, attributable to the alleged contamination. (Plaintiffs' exhibit 9 at p. 5.)

(30) On behalf of the putative class, plaintiffs allege that class members suffer from a multitude of physical injuries as a result of their exposure to hazardous wastes allegedly disposed by defendants, including arthritis, cysts, allergies, cough, asthma, headaches, memory loss, flu-like symptoms, diarrhea, nausea, eye problems, tooth decay, chronic fatigue, skin problems, congestive heart failure, liver problems, kidney problems, high blood pressure, multiple sclerosis, menstrual problems, ovarian polyps, hair loss, weakness, muscle cramps, memory loss, muscle atrophy, acid reflux, cancer, blood disorders, Crohn's disease, spleen problems, immune system prob-

lems, lymph gland disorders and methemoglobinemia, among others. (Defendants' exhibits G through L, response 6(b) (respectively).)

(31) In addition to alleged personal injuries, plaintiffs also claim the following damages on behalf of class members: compensatory damages for pain and suffering, emotional distress, "loss of feeling of well being," "loss of the pleasures of enjoyment of life," inconvenience, anxiety, frustration and limitation of activities; medical monitoring damages; property damages, including "diminution of property value," the "cost of cure," "unreasonable interference with the use and enjoyment of land and property" and "stigma" damages; and injunctive relief. (Plaintiffs' second amended complaint at ¶¶3, 22, 46, 59 and 67 and plaintiffs' brief at pp. 11, 22 and 34.)

(32) Defendant Beazer East Inc. is a Delaware corporation that maintains an address c/o Three Rivers Management Inc., One Oxford Center, Suite 3000, Pittsburgh, Pennsylvania 15219. Beazer was formerly known as Koppers Company Inc. (Plaintiffs' exhibit 10, second amended complaint, ¶7.)

(33) Prior to 1989, Beazer operated a plant in Petrolia that manufactured resorcinol, which is used in resins, adhesives and health care products such as acne medications and skin care treatments. Some of Beazer's industrial wastes were disposed at off-site locations by local waste haulers that serviced the area in the 1950s and 1960s. Some of the wastes may have contained resorcinol and sulfonic acids. There is no evidence that the waste haulers disposed of Beazer's waste at 12 of the 26 suspected disposal sites in the Bear Creek Area, and Beazer

disputes that there is evidence that its waste was disposed at many of the remaining locations. (Defendants' exhibit EE at ¶AC and plaintiffs' exhibit 1 at 42.)

(34) Defendant Indspec Chemical Corporation is a wholly owned subsidiary of Occidental Petroleum Corporation. Indspec has a principal place of business at 411 Seventh Avenue, Suite 300, Pittsburgh, Pennsylvania 15219. Indspec owns a facility located at 133 Main Street, Petrolia, Pennsylvania 16050. On or about December 16, 1988, Indspec purchased certain assets relating to the manufacture of resorcinol, including certain real property and other assets associated with the Petrolia Penacol Plant, from Koppers. (Plaintiffs' exhibit 10, second amended complaint, ¶10.)

(35) Indspec was formed in 1988 to acquire certain portions of the Beazer facility through an asset acquisition in December of that same year. As part of that transaction, Indspec contends that it did not acquire any liability regarding the activities of local waste haulers who disposed of Beazer's waste at off-site disposal locations within the Bear Creek Area. Indspec has submitted evidence that disposal activities at the suspected disposal sites used by local waste haulers ended sometime in the 1970s, which was a decade or more before Indspec existed. Indspec denies that material from Indspec's operations ever was taken to the suspected disposal sites. (Defendants' exhibit EE, defendants' exhibit JJ and plaintiffs' exhibit 3.)

(36) Defendant Crompton Corporation is a Delaware corporation with a principal place of business in Middlebury, Connecticut, which owns and operates a chemical manufacturing facility in Petrolia, Pennsylva-

nia. In September of 1999, Crompton & Knowles Corporation merged with Witco to form Crompton Corporation. Prior to Crompton's ownership of the facility, it was owned and operated by Witco. Prior to Witco's ownership, the facility was owned and operated by L. Sonneborn & Sons Inc. (Plaintiffs' exhibit 10, second amended complaint, ¶8.)

(37) Since 1999, Crompton has owned a plant in Petrolia that manufactures white mineral oil (which is used to make baby oil and in food preparation, cosmetics and pharmaceuticals) and petronate salts (which are used as motor oil additives and in rust inhibitors). During the relevant time period, the principal constituent of the waste generated by the plant was calcium petronate, a chemical compound that is hydrophobic and does not migrate in groundwater. Crompton submitted evidence to the Pennsylvania Department of Environmental Protection (PADEP) in support of its assertion that its facility did not generate sulfonic acids or resorcinol. There is evidence that local waste haulers disposed of waste from the facility at only a few off-site disposal sites and, as to some of these, Crompton disputes that disposal occurred. (Defendants' exhibit FF at ¶AE.)

(38) Defendant Penreco is a Texas general partnership owned by ConocoPhillips Company (successor by merger to Conoco Inc.) and M.E. Zuckerman Specialty Oil Corporation, which does business at a facility located at 138 Petrolia Street, Karns City, Pennsylvania 16041. Prior to becoming a Texas general partnership in 2001, Penreco operated as the Penreco Division of the Pennzoil Company. Prior to 1973, the assets of the Penreco Division of the Pennzoil Company were owned

by the Pennsylvania Refining Company. (Plaintiffs' exhibit 10, second amended complaint, ¶9.)

(39) Penreco is the current owner of an industrial facility that manufactured white oil during the relevant time period. (Defendants' brief at p. 12.) Penreco submitted evidence to PADEP in support of its assertion that its facility did not generate sulfonic acids or resorcinol. (Defendants' exhibit LL.) Penreco denies that it disposed of waste at any of the suspected off-site disposal sites but, instead, deposited it in landfills at its own facility or at licensed disposal sites outside the Bear Creek Area. (Defendants' brief at p. 12.)

(40) Defendant Dick McCall Inc. is a Pennsylvania corporation with a principal place of business in Petrolia, Pennsylvania. (Plaintiffs' exhibit 10, second amended complaint, ¶11.)

(41) McCall is a local Petrolia trucking company that, plaintiffs allege, hauled waste from Crompton's facility. (Plaintiffs' second amended complaint at ¶157.) McCall did not own or operate a manufacturing facility.

(42) Plaintiffs allege that they were exposed to 24 different chemicals that were released into the environment as a result of defendants' disposal practices: Resorcinol, petroleum sulfonates, sulfonic acid(s), xylene, benzene, acetone, phenols, formaldehyde, chloromethane, bromomethane, methyl ethyl ketone, carbon disulfide, trichloroethane, ethyl benzene, nickel, lead, chromium, copper, aluminum sulfate, arsenic, meta-benzene disulfonic acid, benzene sulfonic acid, para-phenol sulfonic acid and calcium petronate-KSS. (Plaintiffs' second amended complaint at ¶16.) Each of these alleged chemicals has different physical characteristics that af-

fect its toxicity, the way it behaves in the environment, and the manner in which it might affect people. For example:

(a) Resorcinol degrades rapidly in the environment and has been reported to occur naturally in areas rich in humic substances, such as peat. (Defendants' exhibit B at ¶13.) At high enough doses, reported potential health effects include skin irritation and thyroid conditions. (Plaintiffs' exhibit 1 at pp. 51-52.) Resorcinol is an ingredient in health and beauty products, including acne medications, hair dyes and rash treatments. (Plaintiffs' exhibit 1 at p. 42.)

(b) Sulfonic acids are a common ingredient in household and personal care products, such as antiperspirants and shampoo. (Defendants' exhibit Q at p. 1.) The toxicity of sulfonic acids is fairly benign. (Defendants' exhibit C at ¶13c.) At high enough doses, sulfonic acids are reported to result in skin irritation. (Plaintiffs' exhibit 1 at pp. 65-66.) Sulfonic acids are related to surfactants, which are used in dust suppression, road construction, PVC pipe applications, coal mining and oil exploration. (Defendants' exhibit Q at p. 1.) They can also be discharged into septic systems designed to leach into the environment. (Defendants' exhibit PP at p. 4.) They are also widely used in herbicides, pesticides and other agricultural applications, and are present in acid mine drainage. (Defendants' exhibit PP at p. 4.)

(c) Calcium petronate is used as a lubricating oil additive and rust inhibitor. It is a very large molecule that is highly immobile in the environment. (Plaintiffs' exhibit 1 at p. 75.) Its physico-chemical properties render it almost entirely insoluble in water so that it does not mi-

grate from soil into groundwater. (Plaintiffs' exhibit 1 at p. 75.) Exposure to high enough concentrations of calcium petronate can cause skin irritation in some people; there have been no harmful effects reported associated with ingestion. (Defendants' exhibit QQ at p. 2.)

(43) For many years, PADEP, the United States Environmental Protection Agency (EPA), the Agency for Toxic Substances Disease Registry (ATSDR) and other government agencies have been involved in implementing and overseeing efforts to investigate and remediate suspected hazardous waste disposal areas in and around the Bear Creek Area. (Defendants' exhibit P and plaintiffs' exhibit 1.) PADEP has identified 26 suspected disposal sites in the Bear Creek Area. (Plaintiffs' exhibit 1 at pp. 8-11.) It has also identified at least 18 companies and individuals, other than defendants, that are alleged to have disposed of waste at the suspected disposal sites. (Defendants' exhibit R at pp. 7-11.) It is undisputed that many of the 26 disposal sites were never used by any of the defendants. The 26 suspected disposal sites are located as much as eight miles apart and each site has different hydrogeologic characteristics. (Defendants' exhibit E.) The sites range from Kelly Farm (which is a few acres in size and about two miles away from the nearest named plaintiff) to Wade-Parsonville (which is very small and more than five miles away from the residence of the nearest named plaintiff). (Defendants' exhibit E.) Three of the locations are currently operating manufacturing facilities that are being remediated under the supervision of PADEP or the EPA; four of the sites have already been remediated under government supervision; at least four were mostly used as municipal or public waste dumps; at least one was used as a disposal site by gasoline refin-

eries; and, as to nine of the sites, there is no evidence of disposal at all by any person or entity. (Plaintiffs' exhibit 1 at pp. 8-11.)

(44) On July 29, 2004, the ATSDR issued its draft Public Health Assessment of the Bear Creek Area for public comment. (Plaintiffs' exhibit 1.) The draft concluded that, with the exception that at that time there was insufficient information with respect to sulfonic acids, chemicals in the Bear Creek Area do not pose an apparent health risk for residents. (Plaintiffs' exhibit 1 at pp 17-27.)

(45) Starting in 2000, PADEP and Beazer began to sample residential drinking water wells for the presence of chemicals potentially associated with historic waste disposal, including resorcinol and sulfonic acids. (Defendants' exhibit D, defendants' exhibit V and defendants' exhibit W.) Out of approximately 500 samples taken from residential wells, fewer than one percent reported detections of benzene sulfonic acid and fewer than five percent reported detections of other forms of sulfonic acids at levels above health guidelines recently proposed by ATSDR. (Defendants' exhibit Y and plaintiffs' exhibit 1.) Additionally, there were no reported detections of resorcinol above health guidelines recently proposed by ATSDR. (Defendants' exhibit Y and plaintiffs' exhibit 1.) The test results also show a high degree of variability within the areas tested, even as between close neighbors. (Defendants' exhibit Y.) None of the six named plaintiffs has tested the groundwater at their properties. (Defendants' exhibit G through L, response no. 5 (respectively).)

(46) In his affidavit, Dr. David Buss, an expert in the hydrogeology of Western Pennsylvania, testified that the

Bear Creek Area contains divergent hydrogeologic features throughout the area. (Defendants' exhibit B at ¶5.) It includes different watersheds; variable topography; numerous streams, rivers and tributaries; various aquifers; and varied groundwater flow. (Defendants' exhibit B at ¶5.) He further concluded, without dispute by plaintiffs, that the groundwater flow is complicated by man-made features, such as mining, oil and gas wells, and utilities, septic tanks and sewage lines. (Defendants' exhibit B at ¶6.) Dr. Buss concluded that:

"(52) It is my opinion, within a reasonable degree of scientific certainty, that, based on the complex and variable hydrogeologic setting in the Bear Creek Area, the differing nature and properties of the chemicals of concern, the presence of background concentrations and other sources of those chemicals in the Bear Creek Area, and the extensive man-made features from mining, oil and gas exploration and other localized factors (septic systems), determining whether a particular well or spring has been impacted by a particular suspected disposal site requires a site-specific assessment for each particular well or spring employing all of the step described above.

"(53) It is also my opinion, within a reasonable degree of scientific certainty, that based upon these same factors, not all properties or purported class members within the Bear Creek Area could or would be impacted by each, if any, of the 26 suspected disposal areas. To determine whether a particular property or purported class member could even be potentially impacted, an individual, site specific assessment would need to be performed." (Defendants' exhibit B at ¶52 and ¶53.)

(47) From the 1930s to approximately December 16, 1988, Koppers owned and operated the Penacol Plant located in Petrolia, Pennsylvania which manufactured a chemical known as resorcinol. (Defense exhibit R, NBAR development report, p. 7.)

(48) Sulfonic acids are an intermediate product of the resorcinol-manufacturing process. Sulfonic acids are also commonly referred to as sulfonates, and include m-BDSA (meta-Benzene Disulfonic Acid), BSA (Benzene Sulfonic Acid), and p-PSA (para-Phenol Sulfonic Acid). (Defense exhibit R, NBAR development report, p. 7.)

(49) Koppers produced a "raphinate," an "X-factor" liquid, resorcinol resins, and resorcinol residue as waste streams between the 1930s and 1979. (Defense exhibit R, NBAR development report, p. 7.)

(50) Prior to 1979, Beazer, Crompton and Penreco contracted with third parties to dispose of industrial wastes from each of the plant sites. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶G; defendants' exhibit FF, consent order and agreement between Crompton and PADEP, ¶8.)

(51) The waste contractors disposed of these industrial wastes at properties in northeastern Butler County and northwestern Armstrong County, Pennsylvania. These disposal locations are those within the Bear Creek Area Site to which plaintiffs' complaint makes reference. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶H; defendants' exhibit FF, consent order and agreement between Crompton and PADEP, ¶7.)

(52) The waste contractors disposed of the wastes in areas that included locations formerly mined for coal. The wastes were placed directly on the land and in direct

contact with the soil, surface water, and groundwater. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶I; defendants' exhibit FF, consent order and agreement between Crompton and PADEP ¶10.)

(53) Each of these disposal areas is within the Bear Creek Chemical Area Site, as defined by the Pennsylvania Department of Environmental Protection, which is, consequently, the same geographic area defined by plaintiffs as the class area.

(54) Beazer retains ownership of the spray field[7] and lagoon[8] areas of the Indpsec plant where releases of resorcinol and sulfonic acids are documented. (Defense exhibit R, NBAR development report, p. 8.)

(55) Given the hydrogeology of the area, the physical and chemical properties of the chemicals at issue, the variable fate and transport of the chemicals, the presence of man-made features, the variability of the types of wells in the region and other factors, there is no common exposure of all class members to alleged contaminated groundwater. (Defendants' exhibit B at ¶52.)

(56) The Petrolia Water Authority draws its water supply from the groundwater. (Plaintiffs' exhibit 9, letter from Harlee Strauss Ph.D. to Charles Frankovic Esq., p. 1.)

---

7. Spray irrigation is a waste disposal process by which waste waters are pumped through a network of pipes (in Koppers' case, in a wooded area and grassy field on the plant property) and released to the environment over a large geographical area through spray nozzle.

8. A lagoon is an earthen impoundment in which various substances, in this case, waste, were stored for various periods of time, sometimes indefinitely.

(57) Beazer and the Department of Environmental Protection have been monitoring and sampling for the presence and extent of groundwater contamination resulting from the defendants' waste disposal practices. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶¶O, Y.)

(58) On or about March 8, 2002, the Pennsylvania Department of Environmental Protection received information indicating that the Borough of Petrolia's public drinking water supply was impacted by hazardous substances and contaminants which defendants had disposed throughout the site. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶R; defendants' exhibit FF, consent order and agreement between Beazer and PADEP, ¶20.)

(59) On or about March 13, 2002, and pursuant to section 501 of the Hazardous Sites Cleanup Act, 35 P.S. §6020.501, Pennsylvania Department of Environmental Protection deemed that all of the disposal areas used by the waste contractors, the Indspec Plant, the Crompton Plant, the Penreco Plant, the Craig Farm NPL site, the Bruin Lagoon NPL site, and the Shaler/JTC HSCA site would collectively be identified as a single contiguous HSCA site, now known as the Bear Creek Area Chemical Site. The site is located in the Boroughs of Petrolia, Fairview, Karns City, and Bruin in Butler County; in Fairview, Parker, Washington and Concord Townships in Butler County; and in Perry Township in Armstrong County. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶S; defendants' exhibit FF, consent order and agreement between Crompton and PADEP, ¶21.)

(60) The site includes the surface water, groundwater, soils, and sediments that have been contaminated from the hazardous substances, contaminants, and/or industrial waste spilled or released from sources within the site, including, but not limited to, the industrial wastes that may have been disposed at one or more of the disposal areas, plant sites, and/or the Craig Farm NPL site, the Bruin Lagoon NPL site, and the Shaler/JTC HSCA site. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶V, defendants' exhibit FF, consent order and agreement between Crompton and PADEP, ¶21.)

(61) On or about March 13, 2002, the Department of Environmental Protection began supplying bottled water to residences and businesses within the Site to replace drinking water that may have been impacted, or threatened to be impacted, by the Site-related hazardous substances, contaminants and/or industrial wastes. (Defendants' exhibit EE, consent order and agreement between Beazer and PADEP, ¶AE; defendants' exhibit FF, consent order and agreement between Crompton and PADEP, ¶32.)

(62) There are approximately 3,614 persons and approximately 1,468 housing units within the site and class of the plaintiffs' originally defined class. (Plaintiffs' exhibit 1, Agency for Toxic Substances and Disease Registry Public Health Assessment, p. 11.)

(63) Plaintiffs reside and own property, or formerly resided or owned property, within the Bear Creek Area Chemical Site, that is, the original and amended class area. (Defendants' exhibit S, map of plaintiff locations of residency.)

(64) There are numerous individualized factors in connection with the evaluation of plaintiffs' claims for personal injuries. According to Dr. Philip Guzelian, a medical doctor and toxicologist, any health assessment must evaluate the dose of any chemical to which a class member was exposed. (Defendants' exhibit 3 at ¶12.) A determination of dose requires an individualized inquiry of factors that will likely vary from class member to class member, including the type of water consumed, the amount of water consumed, the frequency of consumption and the duration of consumption. In addition to determining dose, there are further individual issues that arise out of plaintiffs' personal injury claims. Also according to Dr. Guzelian, a reliable medical assessment of whether exposure to a chemical caused a plaintiff's alleged injury requires an individualized assessment of causation, which includes the process of differential diagnosis and alternative causation analysis. (Defendants' exhibit 3 at ¶12.) As Dr. Guzelian testified, this analysis is also inherently individualized:

"Applying generally accepted medical and toxicological methods of analysis . . . to the claims asserted by plaintiffs, it is my opinion that the personal injury and medical monitoring claims that have been asserted by the named plaintiffs have not been shown to be medically typical of each other, to be representative of the relevant medical and toxicological characteristics of other members of the class, and, therefore, cannot be evaluated from a sound medical perspective on a class-wide basis. Rather, the toxicological/medical process that must be employed to evaluate these claims is highly individualized. Causation conclusions will turn on the individual circumstances of each named plaintiff and class mem-

ber. Based upon the information that I have reviewed, I conclude that significant heterogeneity (differences) exists among the named plaintiffs with regard to such characteristics as the chemicals, the amounts of exposure and amounts of dose, the claimed manifest illnesses and their potential causes. Accordingly, it is my opinion, to a reasonable degree of medical certainty, that the differences among the individual named plaintiffs are so significant that it would be medically improper to use the information associated with the plaintiffs as a basis for determining a medical course of action for hundreds or thousands of unidentified, unexamined individuals in the proposed subclasses." (Defendants' exhibit 3 at ¶3.)

(65) As is set forth in the affidavit of Dr. Guzelian, the claims of the named representatives confirm how individualized the personal injury claims are in this case:

(a) Plaintiff Timothy Lipinski alleges that groundwater contamination caused his arthritis. Dr. Guzelian testified that there is no known toxicological connection between many of Mr. Lipinski's ailments, such as arthritis, and environmental contamination. Rather, arthritis has a known genetic predisposition; Mr. Lipinski's mother, brother and sister all suffer from arthritis. Similarly, others of his alleged ailments have multiple other potential causes. For example, Mr. Lipinski alleges that he suffers from a chronic cough, but he is a long-time heavy smoker, which can cause coughing. Likewise, Mr. Lipinski complains of liver problems, which could be attributable to his alcohol consumption. (Defendants' exhibit 3 at ¶22.)

(b) Many of Mrs. Golling's alleged ailments have numerous potential alternative causes. (Defendants' exhibit 3 at ¶23.)

(c) Many of Mr. Golling's claimed symptoms are commonly attributed to causes other than chemical exposure. (Defendants' exhibit 3 at ¶24.)

(66) Given the nature of the claims and types of injuries alleged in this case, there are also numerous individualized factors in connection with plaintiffs' claims for medical monitoring, including the following:

(a) There are no common background levels of the chemicals since many of them are naturally occurring in the environment (*e.g.,* sulfonic acids) or could be present from sources other than the suspected disposal sites. (Defendants' exhibit B at ¶11.)

(b) Whether a plaintiff has a significantly increased risk of contracting a latent disease requires an individualized inquiry that takes into account, among other things, the person's medical profile, personal risk factors and family history. (Defendants' exhibit C at ¶17.)

(c) Whether there are medical monitoring procedures different from that normally recommended that are reasonably necessary varies depending upon the individual characteristics of each plaintiff and the nature of the injuries alleged. (Defendants' exhibit C at ¶19.)

(67) Plaintiffs did not offer any evidence in response to the affidavit of Dr. Guzelian regarding the many individualized factors inherent in the personal injury and medical monitoring claims. The letter submitted by Dr. Strauss in support of plaintiffs' moving papers does not address these individualized factors or otherwise suggest that plaintiffs' personal injury or medical monitoring claims are not highly individualized. (Plaintiffs' exhibit 9.)

(68) Plaintiffs' claim that their properties have suffered a loss in value as a result of contamination also

involves individual issues. Potential impact will be individualized and vary from property to property depending upon the consideration of various factors, including the real property rights conveyed, market conditions, location, physical characteristics, improvements, use and a myriad of other factors. (Defendants' exhibit D at ¶41.) Mr. David King, a certified real estate appraiser, concluded that:

"Due to numerous and varying types of real estate in the Bear Creek Area, it is self-evident that no two properties are the same and that each property requires an individual appraisal and analysis to determine the impact on value, if any, from any alleged environmental contamination. There are too many factors to consider to validly reach the conclusion that all properties within the area are impacted or that if the properties are impacted, they are impacted in the same or similar manner." (Defendants' exhibit D at ¶41.)

(69) Plaintiffs' other damage claims also raise potential individualized issues, including the claims for emotional distress, loss of enjoyment of property and inconvenience.

## II. CONCLUSIONS OF LAW

(1) The issue before this court is whether the prerequisites for class certification, as stated in the Pennsylvania Rules of Civil Procedure, are satisfied. In order for a class to be certified, Rule 1702 requires that five criteria be met by plaintiffs:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

(2) Rule 1708 of the Pennsylvania Rules of Civil Procedure requires that, in determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the following criteria: (1) whether common questions of law or fact predominate over any question affecting only individual members; (2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action; (3) whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying jurisdictions; (4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues; (5) whether the particular forum is appropriate for the litigation of the claims of the entire class; (6) whether in view of the complexities of the issues or the expenses of litigation the separate claims or individual class members are insufficient in amount to support separate actions; and (7) whether it is likely that the amount which may be recovered by individual class members will be so small in re-

lation to the expense and effort of administering the action as not to justify a class action.

(3) The initial "burden of proof in a class certification proceeding is upon the party seeking certification." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 128, 451 A.2d 451, 454 (1982). This burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.'" *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 653, 637 (1985). In order to satisfy their burden, plaintiffs "must present evidence of the underlying facts from which the court can conclude that the five class certification requirements are met." *Id.*

(4) In evaluating whether plaintiffs have met their burden, the court must consider "all relevant testimony, depositions, admissions and other evidence." See Pa.R.C.P. 1707. Plaintiffs' showing must be supported by more than "mere conjecture and conclusory allegations." *Janicik,* 305 Pa. Super. at 130, 451 A.2d at 455. Once defendants present contrary evidence establishing a conflict on an essential fact, the moving party bears the "risk of non-persuasion." *Id.*

(5) Class certification is a mixed question of law and fact. *Debb v. Chrysler Corp.,* 810 A.2d 137, 154 (Pa. Super. 2002). The court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses, and the substantive merits of defenses. Explanatory comments to Pa.R.C.P. 1707.

(6) Within this context, the requisite factors for class certification are examined below.

*Rule 1702(1)—Numerosity*

(7) Plaintiffs must demonstrate that the proposed class is sufficiently numerous (*i.e.,* that there is a sufficient number of class members to warrant certification) and that the class is ascertainable (*i.e.,* the class must be defined in a way that enables the court to determine who is a class member). See *e.g., Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457.

(8) "[W]here the class definition is so poorly established that the court cannot even discern who the potential class members are, the numerosity criterion has not been met." *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408, 615 A.2d 428, 430 (1992).

(9) Plaintiffs contend that the class is sufficiently numerous because census data in the ATSDR Assessment indicates that, as of 2000, there were 3,416 residents and 1,468 housing units, of which 280 were users of well water, within the Bear Creek Area. However, by their express terms, each of plaintiffs' original proposed subclasses includes only those residents and properties that have been exposed to contamination and, as a proximate result of such exposure, have been injured. Thus, plaintiffs must demonstrate which residents were exposed to contamination and were harmed as a result. *Weinberg v. Sun Co. Inc.,* 740 A.2d 1152 (Pa. Super. 1999) (rejected class definition that required the identification of injured parties), *aff'd in part and rev'd in part on other grounds,* 565 Pa. 612, 777 A.2d 442 (2001); *Mueller v. CBS Inc.,* 200 F.R.D. 227, 233 (W.D. Pa. 2001) (refused to certify class because "determining membership in the class would essentially require a mini-hearing on the merits of each class member's case"); *Sanneman v. Chrysler*

*Corp.,* 191 F.R.D. 441, 446 (E.D. Pa. 2000) (denied class certification because proposed class definition made it "impossible to definitively identify class members prior to individualized fact-finding and litigation"); *Askey v. Occidental Chemical Corp.,* 477 N.Y.S.2d 242, 248 (N.Y. App. Div. 1984) (rejected class definition in a toxic tort case that defined the class by reference to a particular geographic area and did not "identify with any degree of specificity those persons within that area whose bodies have been invaded by a toxic substance and who as a result would need medical monitoring"). The plaintiffs' amended class definition encompasses all persons who resided within the site area since 1949.

(10) Plaintiffs proffer no evidence as to how many persons resided in said area since 1949, nor have they proffered any evidence to establish how many residents or properties in fact have been exposed to contamination that resulted in damage. (Defendants' exhibit B at ¶26.) Therefore, plaintiffs have not met their burden of establishing numerosity.

(11) Even if plaintiffs establish that the number of potential class members is sufficiently large, plaintiffs' five originally proposed subclasses do not satisfy the requirements of Rule 1702(1) because they are not readily ascertainable without undertaking individualized inquiries. Each of the proposed classes is defined to include those individuals who have been injured, or are at an increased risk of future injury, as a result of defendants' waste disposal practices. The plaintiffs' amended two subclasses are likewise too numerous and not well defined within the subclass to sufficiently overcome the numerosity requirement.

(12) Where, as here, the original proposed class is defined as persons or properties that have been injured as a proximate result of the defendants' wrongful conduct, the court must engage in fact-finding on the ultimate issues in the case to determine who qualifies as a class member. A class definition is insufficient where, as here, it would require an individualized determination just to determine who is in the class. See *Weinberg v. Sun Co. Inc.,* 740 A.2d 1152 (Pa. Super. 1999) (rejected class definition that required the identification of injured parties), *aff'd in part and rev'd in part on other grounds,* 565 Pa. 612, 777 A.2d 442 (2001); see also, *Contawe v. Crescent Heights of Am. Inc.,* no. civ.a. 04-2304, 2004 WL 2966931 (E.D. Pa. Dec. 21, 2004) (refused to certify a class of property owners suing for failure to disclose construction defects because, inter alia, plaintiffs failed to define the class adequately); *Mueller v. CBS Inc.,* 200 F.R.D. 227, 233 (W.D. Pa. 2001) (refused to certify class because "determining membership in the class would essentially require a mini-hearing on the merits of each class member's case"). While plaintiffs attempt to avoid the result by their re-defined class and subclasses, they are not successful. The classification into the new subclasses will still require individual determinations.

### Rule 1702(2)—Commonality

(13) The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa.R.C.P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Janicik,* 305 Pa. Super. at 133, 451 A.2d at

457. Thus, it is necessary to establish that the facts surrounding each plaintiff's claim "must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985).

(14) If "each question of disputed fact has a different origin, a different manner of proof and to which there are different defenses, we cannot consider them to be common questions of fact within the meaning of Pa. R.C.P. 1702." *Id.* Where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. *Janick,* 305 Pa. Super. at 133 n.5, 457 A.2d at 457 n.5. "While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 452, 500 A.2d 1137, 1142 (1985).

(15) In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of the alleged damages. "Once a common source of liability has been clearly identified, varying amounts of damages among the plaintiffs will not preclude class certification. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). But where there exist individual issues of causation, including intervening and possibly superseding causes of damages, liability cannot be determined on a class-wide basis. See *e.g., Hanson v. Federal Signal Corp.,* 451 Pa. Super. 260, 679 A.2d 785 (1996) (affirmed denial of class certification on behalf of firefighters seeking damages and injunctive relief for a single injury (hearing loss) caused by a single exposure (occupational exposure to noise from

sirens); *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 615 A.2d 428 (1992) (affirmed denial of certification of a class of children claiming that they were suffering from nursing bottle syndrome); *Cook v. Highland Water & Sewer Authority,* 108 Pa. Commw. 222, 530 A.2d 499 (1987) (affirmed denial of a motion to certify a class of people who suffered personal injury and property damage when two dams and a state highway collapsed during the Johnstown Flood of 1977); *Lewis v. Bayer, AG,* 66 D.&C.4th 470, 489 (Phila. Cty. 2004) (denied certification of a class of people seeking personal injury damages as a result of exposure to a cholesterol-lowering drug, Baycol); *Olympic Inc. v. McKeesport Municipal Water Authority,* 141 P.L.J. 68 (Allegheny Cty. 1993) (denied certification of a class of persons seeking personal injuries and property damage arising out of a giardia infestation of the McKeesport municipal drinking water supply); *Albertson v. Wyeth,* no. 2944 (Phila. Cty. 2005) (denied certification of class of post-menopausal women who have taken high dose Prempro because, inter alia, individual causation issues predominate).

(16) Plaintiffs argue that there are questions of law and fact that are common to the class, including but not limited to claims that the following issues are "common" to all class members: (a) whether defendants' waste disposal practices caused releases of the subject chemicals into the environment; (b) whether the release of contaminants resulted in contamination of drinking water; (c) whether defendants' conduct is an adequate basis of liability under HSCA; (d) whether defendants' waste disposal practices interfered with class members' use and enjoyment of their property; (e) whether alleged contamination resulted in the decreased ability to sell each

class member's property; and (f) whether the alleged contamination resulted in a diminution in the value of class members' property. (Plaintiffs' motion for class certification at ¶6.) Defendants argue that individual issues of law and fact exist and predominate. After reviewing the pleadings, briefs and evidence submitted by the parties, the court finds that individual issues of fact exist and predominate; and, therefore, the commonality requirement is not satisfied. For the reasons set forth in the following sections, plaintiffs have failed to sustain their burden of establishing that the purported "common" issues are in fact susceptible to class-wide proof and, instead, the evidence presented clearly demonstrates that these issues, as well as others, are individualized.

(17) Several of the issues that plaintiffs must address in order to establish liability for their physical injury claims are subject to individualized proof and are not susceptible to class-wide proof, including the following:

(a) There is not a common course of conduct among defendants. Each manufacturing defendant had different products and manufacturing processes; generated different types and quantities of waste at different times; and disposed of waste at different suspected disposal sites, or not at all.

(b) The issue of the extent of exposure to chemicals is also variable among purported class members. The chemicals at issue have different physical, chemical, fate and transport characteristics. And the hydrogeology of the area is highly varied. As a result, exposure is not susceptible to class-wide proof; an individual inquiry as to each class member would be necessary to establish exposure.

(c) The dose to which each purported class member may have been exposed also includes an individualized inquiry that will turn, inter alia, on the degree of exposure and the individual's personal drinking water habits (*e.g.,* the type of water, amount of water, frequency of consumption and duration of consumption), which will likely vary. In addition, each purported class member's individual health history and profile should be evaluated in order to determine what dose is likely to affect that class member.

(d) Assuming that dose could be established, each class member would have to prove, to a reasonable degree of medical certainty, that a chemical attributable to defendants' conduct was a factual cause of his or her injuries. See *J.E.J. v. Tri-County Big Brothers/Big Sisters,* 692 A.2d 582, 585 (Pa. Super. 1997); *Hamil v. Bashline,* 481 Pa. 256, 266-67, 392 A.2d 1280, 1285 (1978). The process of differential diagnosis and alternative causation analysis requires an individualized inquiry.

(e) Many of the injuries alleged occur commonly in the general population and have many different potential causes other than chemicals. Plaintiffs have failed to come forward with evidence that their alleged individual illnesses were caused by the chemicals at issue. As the affidavit of Dr. Guzelian states, the causation analysis required here will be highly individualized given the range and type of ailments alleged, the number of chemicals at issue, and the nature of the claims.

(18) In order to establish a right to medical monitoring for the proposed medical monitoring subclasses, plaintiffs must prove the following elements: (1) exposure greater than normal background levels; (2) to a

proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, there is a significantly increased risk of contracting a latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different than that normally recommended in the absence of exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Redland Soccer Club Inc. v. Department of the Army,* 548 Pa. 178, 195, 696 A.2d 137, 145 (1997). Individual issues also predominate with regard to plaintiffs' medical monitoring claims.

(19) Whether class members were exposed to chemicals at greater than background levels requires an assessment as to both the dose of that person's exposure to chemicals, and whether that dose is in excess of background levels to which that class member was otherwise exposed. These are individual inquiries in light of the physical and chemical properties of the chemicals at issue, the fate and transport of those chemicals, the variable hydrogeology of the area, the presence of man-made structures and individual drinking habits, among other factors.

(20) Medical monitoring requires proof of causation. For the same reasons that causation is an individualized issue in the context of plaintiffs' personal injury claims, so, too, is it an individual inquiry in the context of medical monitoring claims.

(21) Whether a person has a significantly increased risk of contracting a latent disease requires an individualized analysis that takes into account the person's medi-

cal profile, personal risk factors, and family history, among other factors.

(22) Whether there exist medical monitoring procedures different from those normally recommended and that are "reasonably necessary according to contemporary scientific principles" is also an individualized inquiry that depends, among other things, on the particular injury alleged, the diagnostic procedures available and the individual's medical condition. Whether a monitoring program is "reasonably necessary" will require, in this case, an individualized assessment for each plaintiff and class member: Thus, in this case, even considering only the two ailments proposed in the defendants' revised class definition of cancer and thyroid disorders, even if medical monitoring were found either to be or not be necessary and appropriate for one of the named plaintiffs, that conclusion cannot be reliably applied to all the unnamed members of the proposed medical monitoring subclasses. (Exhibit C at ¶19.)

(23) Individual issues also predominate with respect to plaintiffs' property damage claims. (Defendants' exhibit D at ¶22.) Those claims are based principally on legal theories of trespass and nuisance. Thus, the claims turn on whether their properties and drinking water have in fact been contaminated with chemicals released by defendants. For the reasons discussed above, the question of whether any property has been exposed to contamination resulting from defendants' activities is not susceptible of class-wide proof since exposure will vary depending on numerous factors, including proximity to a disposal site, the characteristics of the chemicals, if any, migrating from that site, the fate and transport of those chemicals and the hydrogeology of the area.

(24) In order to recover, each class member must prove that the damage to his or her property is permanent and irremediable. *Rabe v. Shoenberger Coal Co.,* 213 Pa. 252, 62 A. 854 (1906); *Lobozzo v. Adam Eidemiller Inc.,* 437 Pa. 360, 263 A.2d 432 (1970). The permanence of any injury is an individualized inquiry.

(25) Individual issues also predominate with respect to plaintiffs' diminution of value claims. Specifically, given the differences in the type, use, quality and location of property within the proposed class area, it is impossible to generalize to determine whether the alleged environmental contamination has resulted in a uniform impact on property values. (Defendants' exhibit D at ¶12.)

*Rule 1702(3)—Typicality*

(26) In order to establish typicality, plaintiffs must show that their claims arise from a common course of conduct applicable to each class representative and "that the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that pursuit of their interests will advance those of the proposed class members." *Buynak v. PennDOT,* 833 A.2d 1159, 1164 (Pa. Commw. 2003) (reversing class certification in age discrimination case). For the reasons described above concerning commonality, typicality has not been demonstrated.

(27) These class representatives, even under the revised class definitions, suffer from a disqualifying conflict of interest because they purport to represent both the physical injury subclasses and the medical monitoring subclasses. See *In re Pennsylvania Diet Drugs Litigation,* 41 D.&C.4th 78, 106-108 (Phila. Cty. 1999)

(claims of symptomatic class representatives are not typical of the claims of asymptomatic absent class members); *Georgine v. Amchem Prods. Inc.,* 83 F.3d 610, 632 (3d Cir. 1996) (reversed certification of a settlement class of symptomatic and asymptomatic persons seeking damages and medical monitoring for asbestos exposure), *aff'd sub. nom., Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 626 (1997).

(28) Where class representatives are subject to defenses that may not be applicable to the class as a whole, they may not be able to establish the requisite typicality. See *e.g., Wall v. Sunoco Inc.,* 211 F.R.D. 272, 278 (M.D. Pa. 2002) (plaintiff failed to establish typicality in part because "the defendants have defenses that they will be able to use against the plaintiff that they would not be able to use against the other potential plaintiffs.").

(29) These named plaintiffs and certain other putative class members may be subject to defenses not necessarily applicable to the entire class. For example, at least some of the named plaintiffs (as well as putative class members) are alleged to have filed claims later than the two-year tort statute for personal injury and property damage set forth in 42 Pa.C.S. §5524.

(30) The named plaintiffs may be subject to the defense that they cannot establish that the alleged damage to his or her property is permanent and irremediable as required in *Rabe v. Shoenberger Coal Co.,* 213 Pa. 252, 62 A. 854 (1906) and *Lobozzo v. Adam Eidemiller Inc.,* 437 Pa. 360, 263 A.2d 432 (1970), in that none of the named plaintiffs have offered evidence that their properties have in fact been contaminated.

*Rule 1702(4)—Adequacy of Representation*

(31) A class representative must demonstrate that he or she "has the ability and incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Keppley v. School District of Twin Valley,* 866 A.2d 1165, 1175 (Pa. Commw. 2005), quoting *Hassine v. Jeffes,* 846 F.2d 169, 179 (3d Cir. 1988).

(32) Plaintiffs have shown that they are zealous advocates of the class they seek to represent.

(33) Plaintiffs' counsel are experienced and capable of undertaking the representation of the class.

(34) Defendants do not contest the adequacy of counsel. With regard to the requisite absence of conflict, there is a conflict to the extent that the named representatives purport to represent present injury and future injury class members simultaneously, for the reasons discussed in paragraph 27.

*Rule 1702(5)—Fair and Efficient Method of Adjudication*

(35) Rule 1702(5) requires that plaintiffs establish that "a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708." Pa.R.C.P. 1702(5). Although it is not necessary for this court to consider the remaining requirements for certification because plaintiffs have failed to establish the other requirements, the court concludes as follows with regard to the factors set forth in Rule 1708:

## Rule 1708(a)(1)—Manageability

(36) This court is not required to determine that the class action approach is superior to other approaches, but rather is only required to determine that the class action approach provides for a "fair and efficient" method for adjudication of the controversy. Explanatory comments to Pa.R.C.P. 1708. The first factor under Rule 1708 is the difficulty of managing this case as a class action. For the reasons discussed above, individualized hearings would be required to ascertain class membership under the original class definition. Under the revised class definition, there is a high likelihood that individual hearings would be necessary to categorize class members into the appropriate subclasses. More importantly, individual issues overwhelm any common issues in this case. Accordingly, trial on a class action basis would present significant manageability problems as the trier of fact would have to address, on an individual basis for potentially thousands of class members (if plaintiffs' estimates are correct), issues of liability, exposure, dose, causation and damages.

## Rule 1708(a)(3)—Risk of Inconsistent Adjudications

(37) Rule 1708(a)(3) considers whether prosecution of separate actions would create a risk of: (i) inconsistent adjudications that would confront defendants with incompatible standards of conduct; or (ii) adjudications that would be dispositive of the interests of non-parties to the action. See Pa.R.C.P. 1708(a)(3). There does not seem to be a significant risk of inconsistent adjudications here if class certification is denied.

## Rule 1708(a)(4)—Prior Litigation on Similar Issues

(38) Rule 1708(a)(4) directs the court to consider whether there is litigation already pending involving any of the same issues. Pa.R.C.P. 1708(a)(4). There are seven previously filed actions against defendants seeking to recover on essentially the same theories at issue here. While not a significant factor in this court's consideration of class certification, this factor does not weigh in favor of certification.

## Rule 1708(a)(5)—Suitability of the Forum

(39) Rule 1708(a)(5) requires that plaintiffs establish the suitability of the forum court. See Pa.R.C.P. 1708(a)(5). Defendants do not dispute that this case is properly before this court in the initial instance. Defendants have, however, questioned whether, given the breadth of the original and amended class that plaintiffs propose to certify, and the amount of pretrial publicity that this situation has engendered, this county can seat a disinterested jury that has not been swayed by publicity and does not include a member of the class and/or others related to, or familiar with, potential class members. Without determining the merits of defendants' concern, the court does not consider this factor to militate against or in favor of class certification.

## Rule 1708(1)(6) and (7)—The Expense and Amount at Issue

(40) Rules 1708(a)(6) and (7) "analyze whether in view of the complexities of the issues or the expenses of litigation, the separate claims of individual class members are

insufficient in amount to support separate amounts." *Lewis,* 2004 WL 1146692 at *24. In their papers, plaintiffs asserted that their claims "are not de minimis" and, indeed, alleged that they seek to recover "substantial awards." Plaintiffs allege numerous ailments, including very serious illnesses; they seek medical monitoring; and they allege property value diminution. These claims, if viable, are significant enough to pursue outside the context of a class action. Based upon the evidence presented, this court concludes that this factor does not compel certification.

### Rule 1708(b) and (c)—Injunctive Relief

(41) Rule 1708(b) and (c) provides that, where plaintiffs are also seeking injunctive relief, they must satisfy the additional requirement of proving whether defendants have "acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class." See Pa.R.C.P. 1708(b)(2). Plaintiffs here are seeking injunctive relief, and for the reasons discussed above, plaintiffs have failed to meet their burden as to this factor. There is not such conformity of conduct such that equitable relief would be appropriate on a class-wide basis.

(42) While this court recognizes that, where evidence conflicts, doubt should be resolved in favor of class certification. Notwithstanding, under the facts and circumstances of this case, the substantial weight of the evidence compels a denial of class certification.

### III. CONCLUSION

For the foregoing reasons and as set forth in the papers submitted by the parties, the court denies plaintiffs'

motion for class certification and, pursuant to Pa.R.C.P. 1710(a) finds that:

(1) The proposed amended class and subclasses are not sufficiently numerous and/or ascertainable to support certification.

(2) Individual questions of fact predominate with respect to plaintiffs' claims for physical injury, medical monitoring, and property damage, such that there is neither the requisite commonality nor predominance.

(3) The named plaintiffs' claims are not typical of the purported class.

(4) The named plaintiffs have failed to demonstrate that they would be adequate class representatives.

(5) A class action would not provide a fair and efficient method for adjudication of this controversy.

### ORDER

And now, October 18, 2005, upon consideration of plaintiffs' motion for class certification, all responses in opposition, the respective memoranda, all matters of record and in accordance with the contemporaneous memorandum opinion, it is hereby ordered and decreed as follows:

Plaintiffs' motion for class certification is denied.